737 So.2d 64 (1999)
Becky JACQUES, Plaintiff-Appellee,
v.
Walter MOSES, et al., Defendants-Appellants.
No. 98-1389.
Court of Appeal of Louisiana, Third Circuit.
March 3, 1999.
*65 Bernard Seymour Smith, Lafayette, for Becky Jacques.
R. Edward Blanchard and Sidney Wallis Degan, New Orleans, for Walter Moses, et al.
Before YELVERTON, COOKS, and PETERS, Judges.
PETERS, J.
This litigation arises from an automobile accident which occurred in Lafayette, Louisiana, on November 18, 1995. Becky Jacques brought suit against Walter Moses and his liability insurer, Credit General Insurance Company, to recover the damages she sustained in the accident. A bench trial resulted in a judgment in her favor and against the defendants, awarding her $56,166.60 plus legal interest and costs of court. The defendants appealed, asserting four assignments of error. The plaintiff answered the appeal, asserting three assignments of error. For the following reasons, we affirm the trial court's judgment in all respects.
On November 18, 1995, the plaintiff was a guest passenger in a vehicle driven by her husband, Melvin Jacques. As the vehicle stopped at a traffic light at an intersection in Lafayette, Louisiana, it was struck from behind by a vehicle driven by Walter Moses. An ambulance took Mrs. Jacques from the scene to a local hospital, where she was treated and released. Thereafter, three Lafayette, Louisiana health care providers, Dr. John Daigle, a chiropractor; Dr. Louis C. Blanda, an orthopedic surgeon; and Dr. James Domingue, a neurologist, treated her for injuries. The trial court concluded that Mr. Moses' negligence was the sole cause of the accident and rendered judgment *66 awarding the plaintiff $30,000.00 in general damages, $14,011.19 for past medical expenses, $4,480.00 for future medical expenses, $9,963.80 for past lost wages, and $711.70 for future lost wages.
Liability is not at issue. The defendants assert that the trial court erred in awarding excessive damages in each of the five categories awarded. The plaintiff asserts that the trial court erred in not relating her thoracic outlet syndrome condition to the accident, in not awarding adequate general damages, and in not awarding any amount for loss of future earning capacity or permanent disability.

OPINION
The defendants' argument in all four assignments of error regards the trial court's conclusion that the November 18, 1995 accident caused Mrs. Jacques' right extremity carpal tunnel syndrome. The plaintiffs assignments basically address the failure of the trial court to find that she suffered from thoracic outlet syndrome as a result of the accident. As acknowledged by both litigants in brief, these findings by the trial court are factual in nature and are therefore subject to the manifest error analysis. As such, these factual findings cannot be disturbed absent manifest error. Stobart v. State, Dep't of Transp. & Dev., 617 So.2d 880 (La.1993).
In its reasons for judgment, the trial court traced the medical treatment history of the plaintiff from the accident through trial and concluded that, in addition to the carpal tunnel syndrome, she sustained a neck strain, as well as injuries to her shoulder, mid-back, and left knee as a result of the accident. The trial court further found that the accident caused Mrs. Jacques' preexisting spondylolisthesis condition to become symptomatic, causing her to suffer low back pain. Additionally, the trial court found that the plaintiff failed to prove by a preponderance of the evidence that her thoracic outlet syndrome was caused by the accident.
Mrs. Jacques' first complaints immediately after the accident were of pain in the neck and shoulder. An ambulance transferred her to a Lafayette hospital where she was examined by an emergency room physician. The physician diagnosed acute cervical strain. He released Mrs. Jacques with instructions to rest, take ibuprofen for her injuries, and seek additional medical care if her complaints persisted. After a painful and sleepless night, she returned to the hospital the next morning, complaining of numbness of the legs, as well as neck, back, and facial pain. After examination, she was again released, given a prescription for Toradol, and was advised to see a doctor in the next two weeks.
The plaintiff first saw Dr. Daigle two days after the accident, and she complained of neck pain, left shoulder pain, low back pain, headaches, blurred vision, dizziness, and numbness in her legs and left arm. Dr. Daigle diagnosed her injuries as cervical brachial syndrome, cervical cranial syndrome, cervical myofascitis, and sacroiliac sprain and strain. He initially treated her with spinal manipulation, electrical stimulation, massage, traction, and hot packs.
The plaintiff first complained to a medical provider of problems with her right arm on April 2, 1996, or slightly less than five months after the accident. At that time, she complained to Dr. Daigle of pain in her right shoulder, arm, and wrist. She further indicated that she had developed difficulty in using her right arm with any degree of motion. In September 1996, based on the results of a Roos test, Mrs. Jacques' symptoms of tingling and numbness in her right arm, and the weakness found in her grip as compared to previous test results, Dr. Daigle diagnosed her condition as that of thoracic outlet syndrome. Dr. Daigle continued to treat Mrs. Jacques, and in mid-1997, referred her to a massage therapist, Patty Weiss, for massage treatment of the thoracic outlet syndrome and for her headaches. Between June and September 1997, Mrs. Jacques *67 received eight massages. She later reported to Dr. Daigle that the massages gave her relief from her headaches but did little for her right extremity complaints.
On February 10, 1997, Dr. Daigle released Mrs. Jacques to return to work on a part-time basis. However, Mrs. Jacques testified that she could not return to work because of her pain. Dr. Daigle, who treated Mrs. Jacques over one hundred times, finally concluded that continuation of conservative care would not benefit her, and he recommended that she consider surgical intervention or other possible means of treatment.
Mrs. Jacques did not see Dr. Blanda until October 31, 1996. She complained to Dr. Blanda of shooting pain from the base of the skull into the occipital region and tingling in the right arm. According to Dr. Blanda, she told him that after the accident, she had occasional pain in the upper back around the mid-scapula region and had suffered a short episode of low back pain but that the pain had subsided. Dr. Blanda initially tested Mrs. Jacques for carpal tunnel syndrome, but other tests performed revealed results consistent with the possibility that Mrs. Jacques might be suffering from thoracic outlet syndrome. A cervical MRI did not reveal the source of her pain, and in November 1996, Dr. Blanda referred Mrs. Jacques to Dr. Domingue to further explore the possibility that her symptoms were caused by peripheral neuropathy or thoracic outlet syndrome.
Mrs. Jacques did not see Dr. Domingue until September 1997, some ten months later. At that time, she complained of neck pain radiating to both shoulders, numbness of the right arm, and low back pain radiating to the left leg. Dr. Domingue subjected Mrs. Jacques to an EMG and nerve conduction tests, both of which produced results basically confirming a diagnosis of carpal tunnel syndrome. He then referred Mrs. Jacques for physical therapy. In November 1997, Mrs. Jacques reported to Dr. Domingue that the physical therapy had not helped. According to Mrs. Jacques, her low back pain had not improved, although the numbness was slightly better. He recommended that she either continue seeing the chiropractor or have cervical and lumbar myelography and CT scanning. Dr. Domingue was unable to give an explanation for the continued neck pain and offered a final, but admittedly unsupported, diagnosis of chronic neck strain.
The suggested myelogram and CT scanning tests were performed on February 18, 1998. Dr. Blanda, after reviewing the results, concluded that the plaintiff had preaccident spondylolisthesis which was made symptomatic by the accident. Although he still felt it was possible the plaintiff suffered from a mild element of thoracic outlet syndrome, he attributed the principal cause of her extremity problems to carpal tunnel syndrome.

Future Medical Expenses
The defendants' first assignment of error challenges the $4,480.00 award for future medical expenses. That award represents the surgical, hospital, and followup costs associated with the surgical procedure recommended by Dr. Blanda to relieve Mrs. Jacques of her pain associated with carpal tunnel syndrome. The defendants do not dispute that Mrs. Jacques suffers from carpal tunnel syndrome, nor do they dispute that the surgery is necessary. Their only argument is that the plaintiff has failed to establish by a preponderance of the evidence that the condition was caused by the accident.
In support of their position, the defendants point out that the plaintiff only began to complain of carpal tunnel syndrome symptoms in April of 1996, some five months after the accident. They point to Dr. Domingue's testimony wherein he stated in response to the causation question that:
[I]t's a very hard question about which there is no objective data, and my practice has been, after practicing neurology *68 for 20 years with lesions of the wrist, to say that if the symptom complex doesn't appear within a month, that I cannot relate it.

(Emphasis added.)
We note that Dr. Domingue did not rule out the connection, but simply that he could not relate it based on his practice. While not unequivocal himself, Dr. Blanda offered a different opinion. According to Dr. Blanda, it would be unusual for carpal tunnel syndrome to manifest itself five months after an accident, but "[s]ometimes it does happen." Dr. Blanda admitted that such an event might be on the outside of the average period that one might expect, but that it was still "possible."
We further note that there exists lay testimony of arm and shoulder pain manifesting itself within a few days of the accident. Mr. Jacques testified that his wife began complaining of arm numbness within a few days of the accident. Additionally, Mrs. Jacques testified that, although her difficulties began almost immediately, the pain grew progressively worse following the accident, and only after she began to have extreme difficulties did she complain to Dr. Daigle. In fact, although Dr. Blanda based his opinion on a five-month delay in manifestation of symptoms, the period was actually a little over four months. According to Mrs. Jacques, she was free of such symptoms prior to the accident.
The plaintiffs carry the burden of proving causation by a preponderance of the evidence. Morris v. Orleans Parish Sch. Bd., 553 So.2d 427 (La.1989). However, the plaintiff in this case also has the benefit of a presumption. In Housley v. Cerise, 579 So.2d 973, 980 (La.1991), the supreme court, quoted Lucas v. Insurance Company of North America, 342 So.2d 591, 596 (La.1977):
[A] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
While we note the conflict of opinion between Dr. Domingue and Dr. Blanda, we also recognize that where there is a conflict in testimony, we cannot disturb reasonable evaluations of credibility or reasonable inferences of fact, even if we feel that our own evaluations are more reasonable. Rosell v. ESCO, 549 So.2d 840 (La. 1989). Even if a witness is recognized as an expert, the trial court retains the right to accept or reject the expert's conclusions. State v. Hillman, 613 So.2d 1053 (La.App. 3 Cir.), writ denied, 617 So.2d 1181 (La. 1993). Therefore, considering the evidence presented and the presumption in favor of the plaintiff, we find no manifest error in the trial court's determination that this accident caused her carpal tunnel syndrome, and that the future medical expenses are necessary to resolve that condition.

Future Wage Loss
The trial court awarded $711.70 for future lost wages associated with the accident. This award reflects an amount calculated by the trial court to compensate Mrs. Jacques for the time necessary to recover from carpal tunnel release surgery as recommended by Dr. Blanda. In their second assignment of error, the defendants assert that the plaintiff is not entitled to any lost wages for this period, relying on their argument that carpal tunnel syndrome condition was not caused by the accident. As we have already concluded that the trial court did not err in finding the causal connection between the carpal tunnel syndrome and the accident, for the same reasons, we find that this assignment of error has no merit.

Past Lost Wages
At the time of the accident, Mrs. Jacques' source of income was as a painter's *69 helper working for her husband. The trial court awarded $9,963.80 for past lost wages. In doing so, the trial court made the following comments:
Mrs. Jacques testified that she has been unable to return to work assisting her husband since the accident, with the exception of eight days when she tried to work but found it caused her too much pain. Her husband did not pay her a salary. The Jacques' income tax returns reflect that the amount they earned was $7926.00 in 1993, $8777.59 in 1994, $9944.76 in 1995 and $5052.00 in 1996. Since there was no evidence presented of the number of days plaintiff missed work due to the accident in 1993, the court has averaged the earning of 1994 and ten and a half months of 1995 to determine the amount per month the Jacques made while the plaintiff was working, which amount is $776.85. From that amount, the court subtracted the average monthly earnings during 1996 to determine the amount per month attributable to her labor which was $355.85. She missed approximately twenty-eight months of work from the date of the accident until the trial. The court finds that the amount of damages she is entitled to for past lost wages is $9,963.80.
In reviewing the trial court's decision to award damages for lost income, the following standard applies:
The plaintiff must prove by a preponderance of the evidence that he suffered a loss of earning capacity. An award for past lost earnings which is susceptible of mathematical calculation from documentary proof is not subject to the much discretion rule. In order to support an award for loss of earning capacity, the plaintiff must present sufficient evidence to allow the court to calculate the amount of the award with some measure of reasonable certainty.
As a general rule, the plaintiff's detailed and uncorroborated testimony as to loss of earnings may, if reasonable and accepted, support an award for such damages. However, the plaintiffs uncorroborated and self-serving testimony will not be sufficient to support an award if it is shown that there was corroborative evidence which was available and not produced.
Mormon v. Stine, Inc., 95-615, p. 3 (La. App. 3 Cir. 11/2/95); 664 So.2d 600, 602-3 (citations omitted).
Dr. Daigle first released Mrs. Jacques to return to work on February 10, 1997, or almost fifteen months after the accident. Even then, his release was limited to part-time duty. Mrs. Jacques testified that she tried for approximately eight days, but could not continue because of the pain. Given the nature of her work (painter's helper), and the nature of her principal injury (carpal tunnel syndrome), her inability to work is understandable. The trial court concluded that the carpal tunnel syndrome caused her to remain unable to return to work through trial, and based on the totality of the record, we find no manifest error in that conclusion.
The defendants also dispute the appropriateness of the method of calculation of the lost income used by the trial court. The trial court relied on income tax returns to calculate an amount sufficient to compensate Mrs. Jacques for her inability to work after the accident. Under the above standard, the evidence presented by the plaintiffs must allow the court to calculate an amount with reasonable certainty. The defendants argue the trial court erred in its calculation of lost wages because Mrs. Jacques was under a medical work restriction due to the previous accident in 1993. Specifically, after the 1993 accident Dr. Daigle opined: "The motor vehicle accident which precipitated the onset of her chronic knee pain has accelerated the degenerative changes in her right knee which were likely to appear with advancing age. She would be limited to part time work and is unable to lift greater than 10 pounds with repetition." Dr. Daigle's opinion might suggest that Mrs. Jacques *70 did not work full time after the 1993 accident; however, this does not confirm that she either had to stop working full time or obeyed Dr. Daigle's direction. In fact, Mr. Jacques testified that Mrs. Jacques, at the time of this accident, had been working with him (painting, wallpapering, and restoration work) approximately forty hours per week. Weighing the conflicting testimony, we cannot say the trial court erred in finding the injuries sustained in this accident caused her to stop working full time.
The defendants also argue the trial court erred in using the average income derived in 1994 and ten months of 1995 to calculate the amount of lost income. However, we find those are the only two years on which the trial court could have based its calculation since Mrs. Jacques did not work at all in 1996, and only worked part of 1993. Accordingly, this assignment is without merit, and the part of the judgment awarding $9,963.80 for lost wages is affirmed.

Loss of Future Earning Capacity
The plaintiffs argue the trial court should have awarded damages for loss of future earning capacity. The standard for awarding such damages is as follows:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiffs earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiffs lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident.
Batiste v. New Hampshire Ins. Co., 94-1467, pp. 3-4 (La.App. 3 Cir. 5/3/95); 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95); 660 So.2d 472 (citations omitted).
The trial court found Mrs. Jacques had not proved loss of earning capacity or permanent disability, and we agree. While she presented evidence of lost wages, she did not present evidence of a loss of potential. There is nothing offered in evidence to show what her loss of future earnings would be under these circumstances, and there is no suggestion that her future earning capacity is even impaired. Therefore, the trial court's judgment in this respect will not be disturbed.

Thoracic Outlet Syndrome
The plaintiff also assigns as error the trial court's failure to find that she suffered from thoracic outlet syndrome as a result of the accident. In concluding that the plaintiff had failed in her burden of proof on this issue, the trial court made the following statement:
Although Dr. Daigle, plaintiffs chiropractor, diagnosed thoracic outlet syndrome, *71 neither Dr. Domingue, her neurologist, nor Dr. Blanda, her orthopedist, confirmed the diagnosis. Dr. Domingue said that the symptoms in her arm were due to the problems with the nerves at the wrist more than the thoracic outlet syndrome. The test that suggested to him that she might have thoracic outlet syndrome was the Adson's Maneuver. The problem he found with that test was up to forty per cent of the normal population has an abnormal response and therefore the test has very poor ability to distinguish between normal people and those with thoracic outlet syndrome. He said he never diagnosed Mrs. Jacques as having thoracic outlet syndrome. Dr. Blanda thought there was a possibility that she had thoracic outlet syndrome and wanted her to see a cardiovascular surgeon to explore the possibility, but she never saw one. Considering the testimony, the court cannot find that it is more probable than not that she has thoracic outlet syndrome.
While all three health care providers who testified found some evidence of the presence of thoracic outlet syndrome, only Dr. Daigle diagnosed it as being caused by the accident. Both of the physicians' findings addressed the possibility of its existence, but neither confirmed this diagnosis. The fact that the trial court chose to accept the opinion of a neurologist and an orthopedist, and not the diagnosis of a chiropractor, is a factual assessment, subject to the manifest error standard. We find no error in the trial court's judgment in this respect and, accordingly, find no merit in the plaintiffs assignment of error.

General Damages
The defendants seek a decrease in the $30,000.00 general damage award, and the plaintiff seeks an increase to $175,000.00. Both the request for the decrease and the increase are based partially on the arguments presented relative to the existence or non-existence of carpal tunnel syndrome and thoracic outlet syndrome. Having already concluded that we find no error in the trial court's judgment on these issues, we need not consider what effect an adverse ruling on those issues would have on the general damage award.
The standard for appellate review of a trial court's general damages award was set forth by the Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994):
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Further, the supreme court clarified this standard in Andrus v. State Farm Mutual Automobile Insurance Co., 95-0801, pp. 8-9 (La.3/22/96); 670 So.2d 1206, 1210, by stating: "[t]he threshold determination by either the court of appeal or this court is whether the amounts awarded by the trial court constituted an abuse of discretion, in either direction. The standard for that determination is both difficult to express and difficult to apply." In this case, given the nature and extent of the injuries found by the trial court, we find no abuse of discretion in the trial court's award of general damages and decline to decrease or increase that award. Thus, we find no merit in either assignment of error relative to the amount of general damages.

DISPOSITION
For the foregoing reasons, we affirm the trial court's judgment in all respects. *72 Costs of this appeal are taxed equally between the plaintiff and defendants.
AFFIRMED.