| WOODARD, Judge.
Ms. Thelma Fontenot, individually and as the natural tutrix for the minor child, Claudia Fontenot, and Shivone Hamilton filed suit for damages, arising out of an automobile accident, against Mr. James J. Laperouse and his insurer, Allstate Insurance Company (Allstate). Claudia later amended the petition to permit her to prosecute the action individually, as she *280 had reached the age of majority. A jury found Claudia to be 40% at fault in causing the accident and Mr. Laperouse to be 60% at fault. It awarded Claudia past medical expenses and $20,000.00 in general damages. Then, Claudia filed a motion for a judgment notwithstanding the verdict (JNOV) and, alternatively, a new trial. She alleged errors in the jury’s allocation of fault and award of damages. The trial court granted the JNOV and, in the alternative, a new trial as to the allocation of fault, finding Mr. Laperouse to be 100% at fault in causing the accident, and denied Claudia’s request to increase the damages which the jury had awarded. Claudia appeals, asserting that the jury erred in failing to award adequate damages for her injuries. Mr. Laperouse answered the appeal, alleging that the trial court erred in granting the JNOV and apportioning him with 100% of the fault. We affirm, modify the general damage award, and deny an award for damages for loss of future earning capacity.
[[Image here]]
This appeal concerns an automobile accident that occurred on November 20, 1995, when a car, which Claudia operated, collided with Mr. Laperouse’s vehicle at the intersection of East Dale and Weldon Streets in New Iberia, Louisiana. As Claudia traveled west on East Dale Street, she approached the Weldon Street intersection. Traveling in a northerly direction on Weldon Street, Mr. Laperouse attempted to cross the intersection. Claudia struck his vehicle in the side. Her passengers included Shivone Hamilton and her son.
On November 19, 1996, Ms. Thelma Fontenot, individually and as natural tutrix of her minor child, Claudia, and Shivone filed suit against Mr. Laperouse and his insurer, Allstate, for the injuries which the accident allegedly caused. Claudia alleged that she had sustained injuries to her left elbow and back, including a herniated disc pat L3-4 with displacement at the L3 root and a bulging disc at L4-5. The petition requested general damages, loss of past wages and future earning capacity, and past and future medical expenses. Ms. Fontenot, individually, asserted a claim for loss* of consortium.
A jury heard the case on February 9, 1999. It found Mr. Laperouse to be 60% at fault and Claudia to be 40% at fault in causing her damages. It awarded her $20,000.00 in general damages and $4,781.00 in past medical expenses but made no award for future medical expenses, disability, past and future lost earnings, or loss of earning capacity, nor did it award Ms. Fontenot any loss of consortium damages.
On April 27, 1999, Claudia filed a motion for JNOV, or, in the alternative, for an additur or a new trial. She asserted a claim for a JNOV on the issues of liability and damages and argued that the jury erred in its findings of fault and failed to award an adequate amount of damages. The trial court granted her motion for a JNOV on the issue of liability but denied the motion as to damages. It determined that Claudia had no responsibility for the accident and re-allocated 100% of the fault to Mr. Laperouse.
Claudia appeals, asserting error in the jury’s award of damages and seeking an increase in quantum. Mr. Laperouse answered the appeal, asserting that the trial court erred in granting Claudia’s JNOV on the issue of liability.
Judgment Notwithstanding the VeRdict
The Louisiana Supreme Court, in Peterson v. Gibraltar Sav. & Loan,[1] explained the circumstances under which it is appropriate for the trial court to grant a motion for JNOV. The court stated:
*281 JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, is [sic] so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.
lain reviewing a JNOV on appeal, an appellate court determines whether the trial court erred in granting a JNOV by applying the same criteria as required of the trial court in deciding whether or not to grant the motion.[2]
At trial, several witnesses explained their version of the events leading up to the automobile accident. Claudia testified first. The trial transcript contains the following colloquy between Claudia and her counsel:
Q Okay. Tell us what happened as you drove ... down East Dale Street headed towards Weldon?
A Well, we were driving down Dale Street to go to the bank; and, like, all of a sudden, there was a car in front of us,—
[[Image here]]
A —and we hit him.
Q Okay. And what direction was he coming from?
A The left.
[[Image here]]
Q Okay. How much notice did you have that he was going to do this?
A None. He just all of a sudden was in front of us.
Q How fast were you going at the time?
A About 20 to 25 miles per hour.
Q What did you do when he pulled out in front of you?
A I didn’t have time to do anything.
Claudia testified that she did not have time to apply her brakes or take evasive action to avoid the accident. When questioned on cross-examination, she explained that she did not see, nor did she know, if Mr. Laperouse stopped at the stop sign prior to entering the intersection. Shi-vone, a passenger in the Fontenot vehicle, | ¿corroborated Claudia’s version of the accident by testifying that they were traveling on East Dale Street at approximately twenty-five miles per hour when Mr. La-perouse’s vehicle pulled “right out in front” of them. She further stated that the first time she saw Mr. Laperouse’s vehicle was as it pulled into the intersection from her left.
Also, Claudia presented Ms. Toyla Gilbert Charles’ testimony. Ms. Charles testified that, while stopped on Weldon Street at its intersection with East Dale waiting for the traffic to pass, she saw Mr. Laper-ouse’s vehicle traveling toward the stop sign on the opposite corner and go through the sign without stopping. Mr. Laper-ouse’s counsel cross-examined Ms. Charles as to whether or not she really saw Mr. Laperouse run the stop sign, by questioning her about her statement in a prior deposition in which she indicated that, while she was stopped at the stop sign, she was flipping through papers with her head down. Nevertheless, Ms. Charles simply repeated that she saw Mr. Laperouse fun the stop sign.
Next, Mr. Laperouse presented his version of events leading up to the accident, as follows:
Q Okay. Did you stop at the stop sign facing Weldon as you came to Dale Street?
A Yes, sir.
Q Did you come to a complete stop?
A Yes, sir.
*282 Q Did you before the accident see the vehicle being driven by Ms. Fonte-not?
A Yes. I looked to the right, and I saw her a good distance from possibly the middle of the block, and I looked to my left. There was no car there. I looked, and of course, I was going forward, and there was no car there stopped at the stopped sign....
Q And what happened after you stopped?
A I was almost across the street when Ms. Fontenot hit the rear of my car.
| r,Claudia’s counsel cross-examined Mr. Laperouse about his previous deposition testimony regarding the events prior to the accident:
Q Okay. And let’s go back to your deposition when I took your deposition, sir. Did I ask you this question? Question: “but given the facts as they were, do you think you spent enough time observing the traffic on East Dale Street before you entered the intersection?” Answer: “I would think in the future I would stop right there at the stop sign; because, I know now that they travel all kind of speeds on there. I didn’t know that before.” Question: “So now you feel in the future you would stop at the stop sign?” Answer: “ Because yeah, because it don’t look like they pay any attention to the signs.”
Mr. Laperouse testified that he had judged Claudia’s vehicle to be traveling at least twenty-five miles per hour and believed he had adequate time to cross the intersection. However, he explained that he did not know for sure how fast she was going, but that Claudia had to be exceeding twenty-five miles per hour.
Officer Scott Duff, the police officer who responded to the accident, testified as to what he observed and reported after arriving on the scene. He acknowledged that the testimonies, which Claudia, Mr. Laper-ouse, and Ms. Gilbert offered at trial, were consistent with what they had told him at the scene.
Mr. Laperouse asserts that both parties presented evidence that Claudia was a young and inexperienced driver who never saw Mr. Laperouse’s vehicle approaching from her left until immediately before the collision when it was “right in front of her.” He alleges that the evidence offered suggests that she may have been exceeding the speed limit and that there were no obstructions that would have hindered her ability to view the vehicle. Further, he contends that she did not apply her brakes or attempt to move into the unoccupied lane to avoid the collision. Thus, he claims that the evidence supports a finding by the jury that Claudia was liable, in part. He claims that the jury’s allocation of fault was not erroneous since reasonable minds could differ as to what percentage of fault should be allocated to her.
The trial court determined the jury to be in error concerning its finding of fault on Claudia’s behalf. It explained that it granted the JNOV because there was insufficient evidence to find negligence on Claudia’s part and declared that “Reasonable men could not find Claudia Fontenot 40% at fault in causing the accident.”
IfiWe find that the facts of this matter support the trial court’s decision and its determination that Mr. Laperouse failed to provide sufficient evidence to prove his claim that Claudia caused the accident.
The supreme court in Sanchez Fernandez v. General Motors Corp.,[3] explained the duty of a favored driver, a duty applicable to the case sub judice. The court stated:
A motorist on a right of way street is entitled to assume that motorists on the unfavored street approaching a stop sign will obey the traffic signal and will stop, look and yield the right of way to traffic *283 proceeding on the favored street. Of course, once a right of way motorist in the exercise of ordinary vigilence [sic] sees that another motorist has failed to yield the right of way, a new duty thereafter devolves on the right of way motorist to take reasonable steps to avoid an accident if there is enough time to afford him a reasonable opportunity to do so.[4]
The evidence presented strongly indicates that Claudia did not have a reasonable opportunity to avoid the collision, nor could she have prevented the accident from occurring regardless of whether Mr. Laperouse stopped at the stop sign. Claudia and Shivone both testified that they were traveling approximately twenty-five miles per hour as they approached the Weldon intersection and never saw Mr. Laperouse until he was in the intersection. By then, there was no time to take any evasive action to avoid the collision. Although Mr. Laperouse claims that Claudia “had to be traveling faster than the posted speed limit,” he stated that at the time he entered the intersection, he thought that she was traveling twenty-five miles per hour. His claim that Claudia, in part, caused the accident was supported only by his contention that she must have been speeding, photographs of the intersection, and oral assertions which the defense made. He presented no other evidence, expert or otherwise, to suggest that Claudia failed to exercise the ordinary care required of a motorist in a similar situation.
After viewing the evidence in a light most favorable to Mr. Laperouse, we agree with the trial judge that this case warranted a JNOV. We find insufficient evidence to establish that Claudia breached a duty she owed. Accordingly, we find no error injjthe trial court’s judgment granting the Claudia’s motion for JNOV and its subsequent allocation of 100% of the fault to Mr. Laperouse.
General Damages
It is well settled that the discretion vested in the trier of fact, when awarding general damages, is great and even vast, so that the award should rarely be disturbed on appeal.[5] An appellate court is not to decide what it considers to be an appropriate award but to determine whether the trier of fact has abused the discretion it is afforded when awarding such damages.[6] It is only when the appellate court determines that the trier of fact abused its vast discretion that the court should increase or reduce the award.[7]
Claudia testified that her back injury occurred when the collision with Mr. Laperouse’s vehicle caused her body to be thrown forward and to the left, and she hit her left elbow on the driver-side door. She was wearing her seat belt. She explained that she first felt pain in her lower back while being given a ride home from the accident. She reported to the emergency room that afternoon, with a report of pain in her lower back and left elbow. After evaluating the x-rays taken of her back and elbow, the emergency room physician allowed Claudia to return home, prescribing medication.
Claudia said that, after several weeks, the pain in her lower back persisted to the point that she scheduled an appointment with her family physician, Dr. Agapito Castro. Dr. Castro testified that on December 4, 1995, Claudia told him that she had been involved in an automobile accident and she complained of low back pain. When he examined her, he found that she was able to walk and move around without *284 any problem. However, she could only partially flex forward when she attempted to touch her toes. He explained that during his exam, she expressed pain in her sacroiliac joint, but there was no indication that her sciatic nerve had been affected. Dr. Castro Rdiagnosed her as having sacroiliac pain and prescribed no physical activity for two weeks, the use of moist heat on the back, and pain medication.
Claudia testified that after her visit with Dr. Castro, she continued to experience the pain in her lower back. In March of 1996, she sought the opinion of an orthopedic surgeon, Dr. John Humphries. Dr. Humphries ordered an MRI, which revealed a herniated disc at the L3-4 level and a disc bulge at L4-5. He began conservative management treatment of Claudia’s condition which included physical therapy and medication. Dr. Humphries examined her approximately fourteen times over the next three years, the last visit being January 27, 1999. He stated that during this time, Claudia’s condition varied; that at first, she got better; however, there were episodes of increasing pain and severe pain in her right lower extremities, with some experience of numbness in the right leg. As of his final examination, Dr. Humphries testified that he found Claudia to be getting better with continued variance in her back pain. He recommended continued conservative treatment and believed she would not be a candidate for surgery. He attributed her back condition to the automobile accident.
In August of 1998, Claudia sought a second opinion, from Dr. John Cobb, an orthopedic surgeon, regarding the necessity of surgery. He testified that during Claudia’s visit with him, she stated that she had been involved in an automobile accident in November of 1995 and that she suffered from lower back pain and daily headaches. He noted that she described the pain to him as an aching in the center part of her back and sometimes into the right leg, and she also reported that she was experiencing numbness and tingling in the toes of both her feet. He stated that after viewing the MRI, he confirmed a disc herniation at the L3-4 and a bulging disc at L4-5. Dr. Cobb also noted that a fragment from the herniated disc at the L3-4 level protruded into the nerve canal, having an impact on the spinal canal at that level. He estimated the size of the herniated disc to be a six or seven, on a scale of zero to ten and recommended a disc excision be performed to remove the herniated disc and a fusion to stabilize the spine. He opined that it was more likely than not that the automobile accident caused her injuries.
Dr. John Shutte, an orthopedic surgeon whom Allstate had retained, examined Claudia. He reported that she presented with a herniated disc and complaints of intermittent back pain with severe pain occurring several times a week. He believed |9that Claudia’s condition resulted from a degenerative disc disease that predated the accident. Moreover, he explained that, in his opinion, had Claudia’s disc become herniated as a result of the automobile accident, she would have voiced symptoms of lower extremity pain and numbness immediately, which neither her records nor her treating physicians indicated. Lastly, Dr. Shutte opined that surgery should not be an option for Claudia.
Dr. Humphries assigned Claudia to be ten to fifteen percent permanently impaired, whole body, while Dr. Cobb assigned twelve percent prior to surgery and twenty percent after surgery. Claudia, sixteen-years-old at the time of the accident, argues that her condition has prevented her from participating in high school athletics and recreational jogging, activities which she preformed before the accident. During her treatment, she discontinued using prescription pain medication because she said that it would make “[her] sleep a lot” and hindered her ability to do her school work and her back pain makes it hard for her to concentrate and sit for long periods at a time. Ms. Fonte-not, Claudia’s mother, testified that Clau *285 dia has made complaints of back pain since the accident and that soon after the accident, she became “moody and grouchy” and was able to help out less around the house. Mona Fontenot, Claudia’s sister, and Shivone also testified regarding Claudia’s complaints of back pain after the accident and her inability to perform physical activities that she enjoyed before the accident.
Having reviewed the evidence, we hold that the jury abused its discretion in its award of general damages. For similar back injuries that have not been subject to an operation, we have required an award of at least $100,000.00.[8] Accordingly, we increase her award to $100,000.00 in general damages.
Loss of Earning Capacity
Claudia argues that the jury abused its discretion by failing to award her any compensation for her past and future lost earnings and loss of earning capacity.
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trier of fact should consider the degree in which the hnplaintiffs injuries disadvantages her ability to earn, rather than what the plaintiff actually earned prior to the injury.[9]
Claudia presented the testimony of a vocational rehabilitation counselor and economist regarding the loss of earning capacity. The vocational rehabilitation expert testified as to statistics regarding the variance in monthly earnings between women with and without a non-severe disability and the same educational background as the plaintiff. Her economist used these figures to project a loss of earning capacity. Although she presented this expert testimony, we do not find that the jury was manifestly erroneous in its determination regarding a loss of earning capacity.
The evidence showed that at the time of the accident, Claudia was sixteen years of age and a full-time high school student with no regular employment. After the accident she maintained a job at McDonald’s and performed clerical work for her brother’s business. Claudia testified that her back condition did not cause her to leave either of the jobs. There was further evidence that Claudia successfully completed high school and, at the time of trial, was a freshman in college studying business. Dr. Humphries, Claudia’s treating physician, testified that Claudia could physically perform work in an accounting or business management-type employment, but ruled out any type of manual labor. Dr. Shutte also found that although Claudia would not be suited for manual labor, he thought she could perform accounting in an office-type setting. Her vocational expert stated in his testimony that after evaluating Claudia’s educational background, he believed Claudia did not have the mental capability to finish college. However, the evidence showed that Claudia maintained an average performance in college and that her earning potential would be more if, in fact, she completed her college education.
Thus, in light of the testimony presented, we conclude that the jury’s determination on this issue is not clearly wrong. Accordingly, we find this assignment of error meritless.
CONCLUSION
We affirm the trial court’s judgment granting Claudia’s JNOV as to liability, amend the jury’s decision on general damages and increase the award to $100,000.00, In affirm the denial of her *286 claimed loss of earning capacity, and cast the Defendants with the costs of this appeal.
AFFIRMED.
WOODARD, J., dissents in part, finding that Claudia is entitled to an award for loss of earning capacity and assigns written reasons.
AMY, J., dissents in part and assigns reasons.

. 98-1601 (La.5/18/99); 733 So.2d 1198, 1203; see also, Anderson v. New Orleans Public Serv., Inc., 583 So.2d 829 (La.1991).

. Anderson, 583 So.2d 829. See Thrash v. Maerhofer, 99-375 (La.App. 3 Cir. 11/17/99); 745 So.2d 1238, writ denied, 99-3578 (La.2/18/00); 754 So.2d 966.

. 491 So.2d 633 (La.1986).

. Id. at 636 (citation omitted).

. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Andrus v. State Farm Mut. Auto. Ins. Co., 95-801 (La.3/22/96); 670 So.2d 1206.

. Andrus, 670 So.2d 1206.

. Id.

. Thompson v. Stalnaker's Restaurant, Inc., 93-1447 (La.App. 3 Cir. 6/1/94); 640 So.2d 733, writ denied, 94-1799 (La.10/14/94); 643 So.2d 165; Mouton v. Bonnett, 520 So.2d 1145 (La.App. 3 Cir.), writ denied, 521 So.2d 1138 (La.1988).

. Jacques v. Moses, 98-1389 (La.App. 3 Cir. 3/3/99); 737 So.2d 64.