# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 04-439


SUSAN BROWN, ET AL.

VERSUS

FOSTER R. STICKLEY, M.D., ET AL.


**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 71311
HONORABLE JOHN D. TRAHAN, DISTRICT JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Jimmie C. Peters, Glenn B. Gremillion, and Billy H. Ezell, Judges.

**AFFIRMED.**


**Joseph T. Dalrymple**
**Rivers, Beck, & Dalrymple**
**P. O. Drawer 12850**
**Alexandria, LA 71315-2850**
**(318) 445-6581**
**Counsel for Plaintiff/Appellee**
        **Susan Brown, Individually**

**James R. Shelton**
**Durio, McGoffin, Stagg & Ackerman**
**P. O. Box 51308**
**Lafayette, LA 70505-1308**
**(337) 233-0300**
**Counsel for Defendants/Appellants**
**St. Paul Fire & Marine Ins. Co.**
**Foster R. Stickley, M.D.**

GREMILLION, Judge.

In this case, the plaintiff, Susan Brown individually and on behalf of her minor son, Arkel Brown, appeals the jury's judgment in favor of the defendant, Dr. R. Foster Stickley, finding that he did not commit medical malpractice. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Brown filed suit against Dr. Stickley in March 1997, claiming that her son was born with severe deficits and defects due to Dr. Stickley's negligence. Brown alleged that Dr. Stickley ordered x-rays, dye tests, and fluoroscopy without first ascertaining whether she was pregnant, and as a direct result of said tests, her son was born with severe defects.

A jury trial was held and the jury rendered a verdict dismissing all claims against Dr. Stickley. Thereafter, Brown filed a motion for JNOV, which was denied. In denying the JNOV, the trial court stated that the issue at trial was only whether Dr. Stickley should have administered a pregnancy test before giving her the tests. The trial court further stated that the jury concluded that Dr. Stickley was justified in believing Brown was not pregnant. Brown now appeals.

## ISSUES

Brown assigns as error:

1. The jury's findings were not only manifestly erroneous, but amounted to jury nullification because the jury ignored certain testimony, including Dr. Stickley's own testimony that he committed malpractice.

2. The trial court erred in denying her JNOV.

1

3.   The jury committed manifest error in disregarding overwhelming evidence of deviations from the standard of care by Dr. Stickley.

**LAW**

A court of appeal may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

> The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Id.* at 844.

Though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Id.* "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart v. State Through DOTD*, 617 So.2d 880, 883 (La.1993). "The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id.* at 882.

In a medical malpractice action, the plaintiff's burden is set forth in La.R.S. 9:2794(A), which states that the plaintiff must prove:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical

2

negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

## EVIDENCE

Brown's pretrial memorandum stated there were three focal issues in this medical malpractice claim, to wit, that Dr. Stickley was negligent in failing to appreciate the obvious signs of Brown's pregnancy and to diagnose the same, in failing to administer a pregnancy test prior to ordering x-rays and other medications contraindicated in pregnancy, and in failing to advise Brown of the risk of x-rays.

The uncontroverted evidence is that Brown had been Dr. Stickley's patient since 1989, when she was fifteen years old. At that time she began taking birth control pills. In October 1991, he delivered her first baby, a son. On February 2, 1995, Brown complained to Dr. Stickley that she was having abdominal pain and that she had missed some of her birth control pills. Dr. Stickley ordered a pregnancy test, administered on February 16, 1995, which was negative. In March 1995, Dr. Stickley ordered an ultrasound after Brown continued to complain of pain. The ultrasound revealed an ovarian cyst on her left ovary. At a March 28, 1995 appointment, Dr. Stickley started Brown on birth control pills to treat the cyst. Two weeks later, on April 11, 1995, Brown returned for another ultrasound to monitor the cyst. No evidence of pregnancy was revealed at this ultrasound. Dr. Stickley next

3

saw Brown on April 20, 1995, when she complained of severe abdominal pain. Dr. Brown noted in his records "no coitus," and ordered several tests, which are at issue in this case.

The tests, which exposed Brown and her embryo to radiation, were conducted on April 24-25, 1995. Brown was approximately four weeks pregnant at the time.

Brown testified she dropped out of school in the ninth grade. She stated that, at the April 20, 1995 appointment, she told Dr. Stickley that she was having stomach pain, could not keep any food down, and was gaining weight. She stated that Dr. Stickley told her that she might have an ulcer. Brown testified that she menstruated in February, twice in March, and not at all in April 2004. Brown testified that Dr. Stickley did not ask her if she thought she was pregnant nor if she had been having sex. She also stated that, prior to the April 20th appointment, she was having sex every night. She again testified that the issues of sex and pregnancy were never mentioned at the visit.

Brown testified that she was warned about the potential risks x-rays pose to developing babies, but only after her x-rays were completed. Brown testified that she realized she might be pregnant sometime in May, so she went and bought a home pregnancy test, which came back positive.

Brown testified that she called Dr. Stickley's office and was urged to come in right away. She stated that Dr. Stickley warned her of the possibility for severe defects in her unborn child due to the x-rays. She stated that he recommended she have an abortion. Brown testified that she was so upset by this that she told him

4

that she no longer wanted to be his patient. Brown stated that she did not believe in abortion and was constantly worried and depressed throughout her pregnancy concerning the state of her baby. Brown went on to describe the difficulties she encountered following Arkel's birth. She testified that she signed the consent forms prior to the x-rays because she did not think she was pregnant since Dr. Stickley did not tell her she was pregnant.

Dr. Stickley testified that he first began seeing Brown in 1989. He stated that he delivered her first child in 1991, via caesarean section. In January 1994, Dr. Stickley removed a Norplant birth control device he had implanted in Brown's arm because she wanted to get pregnant. In August 1994, Dr. Stickley prescribed birth control pills to Brown. In October 1994, Dr. Stickley notated changing Brown's birth control pill prescription from one brand to another. Brown next visited Dr. Stickley in February 1995, complaining of pain in the lower abdomen and nausea. His records indicate she had her last period in January and had "messed up" on the birth control pills for two days. Dr. Stickley's records indicate that he ordered a pregnancy test on February 16, 1995, which was negative. Dr. Stickley next ordered an ultrasound on March 24, 1995, to determine the cause of Brown's irregular menstrual cycle. The ultrasound showed that she had an ovarian cyst. It also showed no evidence of intrauterine pregnancy. Brown next visited Dr. Stickley on March 28, 1995, regarding her ovarian cyst. At this time he prescribed birth control pills to treat the cyst and indicated that a follow-up ultrasound would be done in two weeks. The follow-up ultrasound was conducted on April 11, 1995, which showed no evidence of ovarian cyst or intrauterine pregnancy.

The next time Brown visited Dr. Stickley was on April 20, 1995, the date of the alleged deviation from the standard of care. Dr. Stickley's notes read "Questionable problems. No coitus. Wakes up at six (6:00) a.m." Dr. Stickley stated that he palpated Brown's stomach where she described the pain checking for various things. He also described the pelvic exam he performed on Brown that day. Dr. Stickley noted in the diagnosis section: "Work-up. Ultrasound, GI Series, Barium Enema."

Dr. Stickley testified that his notation "no coitus" indicated that Brown had told him that she had not had sex since the last pregnancy test. He stated that he is well aware of the dangers of doing x-rays on a pregnant woman and that he would never have ordered them if she had indicated that she had sex since the previous pregnancy test. He stated that Brown did not tell him that she was having sex every day as she and her then-boyfriend, Jimmy Thomas, testified. Dr. Stickley went on to describe the various reasons he ordered the tests: the GI Series to determine if she had an ulcer, the KUB or plain x-ray of the kidneys, uterus, and bladder to determine what was causing her pain upon urination, urinalysis to make sure there was no infection or blood in her urine, and the barium enema to rule out diverticulitis.

Dr. Stickley went on to testify that he did not refer Brown to a gastroenterologist because there are none in the area who accept Medicaid patients. When Dr. Stickley was questioned as to why he does not perform pregnancy tests on every single woman of child-bearing age before ordering x-rays, he stated that urine pregnancy tests, especially at the time, were not accurate and that they had many false negatives. He further stated that they do not do blood pregnancy tests in the office;

6

they send those out to a lab. Dr. Stickley went on to testify that Brown ended up in the emergency room due to her stomach pain on April 27, 1995, and that the records indicate that she told the nurse that her last period was in "4/95."

Dr. Stickley next saw Brown on May 3, 1995, at which time he prescribed antibiotics for a vaginal infection. Thereafter, Dr. Stickley received a phone call from Brown indicating that a home pregnancy test had come back positive. Dr. Stickley ordered an ultrasound for May 18, 1995, and prescribed some prenatal vitamins.

On May 22, 1995, Dr.Stickley noted that Brown had received radiation while pregnant. He testified that he discussed the radiation and its effects on the baby with the radiologist, Dr. Pam Darr, who performed the tests. Dr. Stickley next saw Brown on May 30, 1995, at which time he discussed the possibility of her having an abortion. However, he stated that she did not believe in abortions and instead, would be monitored via ultrasound.

On cross-examination, Dr. Stickley admitted that another time in Brown's records he noted "no coitus," but that this was an admonition not to have sex. He also did not know why he did not use the terminology "LMP" or "last menstrual period" to note when she last menstruated.

Dr. Pamela Darr testified that, on two separate occasions on April 24 and 25th, 1995, Brown signed a sheet of paper stating "I AM NOT PREGNANT AND HAVE NO REASON TO BELIEVE I AM PREGNANT. I AM NOT LATE FOR A MENSTRUAL CYCLE." Dr. Darr stated that it is her routine practice to question women in their child-bearing years as to whether or not they could possibly be

pregnant. Dr. Darr also testified that she routinely asks all patients whether or not they are having unprotected sex, and if they are, she will not perform any tests on them.

Dr. Bruce Halbridge, an obstetrician/gynecologist in Houston, Texas, testified as an expert on behalf of Brown. He said that he has delivered approximately 7,000 babies over the course of his career. Dr. Halbridge testified that, after reviewing all of the documentary evidence, he believed Dr. Stickley deviated from the standard of care by not being certain that Brown was not pregnant before ordering diagnostic radiology tests such as x-rays. Dr. Halbridge described a series of questions and examinations that Dr. Stickley should have asked and conducted. Dr. Halbridge testified that Dr. Stickley's brief notations in his charts on April 20, 1995, were inadequate in that it did not go through the series of questions he felt should be asked such as documenting the patient's menstrual history, sexual history, whether or not she is taking her medicines, including birth control pills, or has forgotten to take some. He further stated the notation does not describe the pain, her bowel habits, or whether she had any chills or fever, which would be important in determining what is wrong. He also stated Dr. Stickley failed to conduct an abdominal and pelvic exam. Dr. Halbridge further testified that the notation "no coitus" was insufficient to indicate Brown had not had sex in the two months following her most recent pregnancy test. Dr. Halbridge indicated that the standard of care would require more detailed notations regarding sexual history and birth control use. He further testified that, in a twenty-year-old patient experiencing abdominal pain, his first instinct would be to conduct a pregnancy test to rule out

8

ectopic or tubal pregnancy or impending miscarriage. Dr. Halbridge stated that the standard of care compelled the administration of a blood pregnancy test based on her complaints. He further testified it was a deviation from the standard of care to fail to conduct an abdominal examination based on the symptoms she presented. He went on to state, that no matter what information was given by the patient as to sexual history, the standard of care required a blood pregnancy test to rule out pregnancy before proceeding with any further tests.

Dr. Halbridge stated that the tests Dr. Stickley ordered deviated from the standard of care because none of her symptoms indicated they were necessary. He further stated that other tests existed to check for the problems Dr. Stickley suspected that Brown might have, which did not involve any radiation exposure, including sonograms to check for gallbladder disease, blood tests to check the functioning of the pancreas, and referral to a gastroenterologist who can use a fiberoptic scope placed in the throat to see if an ulcer exists.

Dr. Halbridge also testified that Brown's signature on the consent forms indicating that she was not pregnant is not an adequate way to ensure a patient is not pregnant. He stated it is the doctor's responsibility to determine whether or not the patient is pregnant before ever sending her to radiology to undergo tests. Dr. Halbridge stated this failure was a deviation from the standard of care. Dr. Halbridge further testified that this responsibility cannot be delegated and that the standard of care required Dr. Stickley to conduct a pregnancy test. Dr. Halbridge also stated that he has never seen a case of diverticulitis in a twenty-year-old woman and that no rationale existed for the studies that Dr. Stickley ordered.

9

On cross-examination, Dr. Halbridge stated that doctors vary in their way they keep their charts. After being shown Dr. Stickley's charts he admitted that he did not know what Dr. Stickley's notations and markings meant. He further admitted that Dr. Stickley did conduct a pelvic examination, but that he could not decipher the findings from examining Dr. Stickley's charts. He further admitted that Dr. Stickley's suspicions that Brown had an ulcer turned out to be correct. Dr. Halbridge also admitted that he has no idea how doctors in Crowley, Louisiana, conduct their business or what effects a Medicaid card would have on the administration of tests.

Dr. Halbridge was then questioned regarding Dr. Stickley's contention that "no coitus" meant no sexual intercourse since the previous pregnancy test and whether a doctor should rely on the fact that a patient says she has not had sexual intercourse. He noted that sometimes patients forget whether or not they have had sexual intercourse, but admitted it would be hard to forget to having sex every day as testified to by both Brown and Jimmy Thomas.

Dr. Marshall St. Amant, an obstetrician/gynecologist with a specialty in maternal fetal medicine, was a member of the medical review panel that reviewed the claim against Dr. Stickley. Dr. St. Amant testified that it was his, and the other two panel members' opinion, that Dr. Stickley did not breach the standard of care. Dr. St. Amant testified that, since the medical review panel convened, he further reviewed the expert testimony of Drs. Brenner, Willis, and Bushong and that his opinion that Dr. Stickley did not breach the standard of care had not changed.[1] Dr. St. Amant further testified that Dr. Stickley's charting methods are quite common and do not fall

---

[1] These doctors all testified regarding the amount of radiation that Arkel received as well as the effects, if any, of the radiation.

10

below the standard of care. Dr. St. Amant further testified that it has never been incumbent upon a physician to order either a serum or urine pregnancy test before proceeding with necessary tests such as x-rays. Dr. St. Amant further testified that the various tests ordered by Dr. Stickley did not breach the standard of care. He stated that the treating physician has an impression as to what may be wrong with the patient and is in the best position to make decisions about which tests to administer.

After reviewing the evidence and testimony submitted to the jury, even though we may have felt differently, we cannot say it committed manifest error in finding that Dr. Stickley did not breach the standard of care. A doctor's professional judgment and conduct is to be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events. *Charpentier v. Lammico Ins. Co.*, 606 So.2d 83 (La.App. 3 Cir. 1992). Moreover, "[w]hen the expert opinions contradict concerning compliance with the applicable standard of care, the trial court's conclusion on this issue will be granted great deference. It is the sole province of the factfinder to evaluate the credibility of such experts and their testimony." *Id.* at 87.

Dr. Stickley testified that his records stating "no coitus," indicated that Brown told him she had not had sexual intercourse since her last pregnancy test. Brown testified that she never told him that. Instead, she testified that she and Thomas were having sex on a daily basis. Dr. Stickley testified he is well aware of the risks that x-rays pose to pregnant women and that he would never have ordered the tests without first asking Brown if she was pregnant.

11

Dr. Halbridge testified that he felt Dr. Stickley deviated from the standard of care basically because his documentation was inadequate and in failing to be 100% certain that Brown was not pregnant before administering the tests. Dr. St. Amant, on the other hand, testified that there is no standard requiring a doctor to administer a blood or urine pregnancy test before ordering x-rays. He testified that a doctor can make this determination based on numerous factors, such as his relationship with the patient and the responses he receives to the questions he asks. Finally, the patient herself noted on the forms that she was not pregnant, had no reason to believe that she was pregnant, and was not late for a menstrual period.

There was a multitude of testimony regarding the amount of radiation, as well as the effects the radiation, on Brown's fetus. Because we have found that the jury did not err in finding that Dr. Stickley did not breach the standard of care, we need not address these issues.

**JNOV**

Finally, Brown centers her appeal on the ordering of the various tests alleging that they were medically unnecessary, which she claims Dr. Stickley admitted. However, and as noted by the trial court in reasons for denying the JNOV, the

> issue of whether or not Dr. Stickley deviated from the standard of care by ordering tests that were not medically indicated was not . . . properly before the jury. The issue for the jury to decide was whether he should have given her a pregnancy test before ordering tests that exposed the fetus to radiation.

We agree. In *Love v. Lewis*, 00-06, pp. 4-5 (La.App. 3 Cir. 10/12/00), 771 So.2d 220 222, *writ denied*, 00-3506 (La. 2/16/01), 786 So.2d 102, we stated:

12

La.Code Civ.P. art. 1811 provides the basis for filing a Motion for JNOV. However, Article 1811 does not set forth any specific grounds on which a trial court may set aside a verdict. Therefore, we rely on the well-settled jurisprudence that a JNOV may only be granted when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable people could not arrive at a contrary verdict on the facts at issue. *Peterson v. Gibraltar Sav. & Loan*, 98-1601(La.5/18/99); 733 So.2d 1198. Additionally, "[t]he trial court may not weigh the evidence, pass on the credibility of witnesses, or substitute the reasonable inferences of the facts for those of the jury." *McBride v. H. Brown Machine Shop*, 98-1271, p. 3 (La.App. 3 Cir. 3/31/99); 732 So.2d 650, 652, writ denied, 99-1288 (La.7/2/99); 747 So.2d 20, quoting *Webb v. Goodley*, 512 So.2d 527, 530 (La.App. 3 Cir.1987). In reviewing the grant of a JNOV, an appellate court must first determine whether the trial court erred in granting the JNOV. The appellate court does this by applying the same criteria as the trial court. *Anderson v. New Orleans Public Service, Inc.*, 583 So.2d 829 (La.1991). If reasonable people could have arrived at the same verdict, given the evidence presented to the jury, then the JNOV is improper. Id.

We find no error in the trial court's refusal to grant the motion for JNOV. Furthermore, even if we considered Brown's argument, that the tests were unnecessary, we still conclude that reasonable people could find that Dr. Stickley did not breach the standard of care. Despite Brown's allegations, the testimony reveals that Dr. Stickley ordered the various tests to rule out possible problems. It was only in hindsight that he determined that they were "medically unnecessary" as Brown did not have the problems he was suspicious of. Accordingly, this assignment of error is without merit.

## CONCLUSION

The judgment in favor of the defendant-appellee, Dr. R. Foster Stickley, is affirmed. All costs of this appeal are assessed to the plaintiff-appellant, Susan Brown.

**AFFIRMED.**

13