STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

05-1169

VERONICA RAY WHITTINGTON

VERSUS

PATRICK SAVOY, M.D.

**********
APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2000-669
HONORABLE JOHN P. NAVARRE, DISTRICT JUDGE
**********

GLENN B. GREMILLION
JUDGE

**********

Court composed of Jimmie C. Peters, Michael G. Sullivan, and Glenn B. Gremillion, Judges.

AFFIRMED.

Eugene A. Ledet, Jr.
Rivers, Beck, Dalrymple & Ledet
P. O. Drawer 12850
Alexandria, LA 71315-2850
(318) 445-6581
Counsel for Plaintiff/Appellant:
    Veronica Ray Whittington

James R. Shelton
Durio, McGoffin, Stagg & Ackermann
P. O. Box 51308
Lafayette, LA 70505-1308
(337) 233-0300
Counsel for Defendant/Appellee:
    Patrick Savoy, M.D.

GREMILLION, Judge.

The plaintiff, Veronica Ray Whittington, appeals the trial court's judgment finding that she failed to satisfy her burden of proving that the defendant, Dr. Patrick Savoy, committed medical malpractice. For the following reasons, we affirm.

**FACTS**

Whittington, the mother of two children, underwent cesarian sections both times instead of normal parturition. These procedures resulted in a vertical scar from her umbilicus, or navel, down towards the pubis bone. In addition to the cesarian sections, she underwent a hysterectomy, which utilized the scar as a portal for the procedure. After a time, Whittington described her lower abdomen as resembling a "butt," because her stomach was divided into halves via the resulting crevice caused by her scar.

Whittington approached Dr. Savoy, a general surgeon, who had performed an appendectomy on her son, about correcting her scar. In examining her, he discovered an incisional hernia in her lower abdomen and recommended surgery to correct the problem. In addition to the hernia repair, he agreed to perform an abdominoplasty to correct the scar and the appearance of her abdomen. These procedures were performed on January 19, 1998. Following surgery, Whittington claimed that her incision extended from her pubis to her breast bone. She developed several seromas and a painful protrusion above her umbilicus, which Dr. Savoy thought might require a later surgery or liposuction to correct. She continued follow-up treatment with him until March 19, 1998, when he released her to return to work.

1

Unhappy with the resulting scar and protrusion, Whittington sought treatment from Dr. Phillip Lindsay, a general surgeon, in Alexandria, Louisiana. On June 15, 1998, she underwent surgery to reduce the bulge and the scar.

Whittington filed a medical malpractice claim against Dr. Savoy based on the unsightly and lengthy scar left from his surgery. The matter was reviewed by a medical review panel, which found no breach of the standard of care attributable to a general surgeon in performing a hernia repair and an abdominoplasty. It further found that the length of the scar was immaterial to Whittington's complaint.

Whittington filed the instant suit against Dr. Savoy seeking damages as a result of his medical malpractice. She later added his malpractice insurer, St. Paul Fire and Marine Insurance Company. The matter proceeded to a bench trial after Whittington stipulated that her damages did not exceed $50,000. Following the close of evidence, the trial court took the matter under advisement. It then issued written reasons finding that Whittington failed to satisfy her burden of proving that Dr. Savoy breached the applicable standard of care. Thereafter, judgment was rendered dismissing her claims against him. This appeal by Whittington followed.

## ISSUES

Whittington raises three assignments of error on appeal. She claims that the trial court erred in allowing the medical review panel's opinion into evidence, in finding that Dr. Lindsay was unsure about the length of his incision, and in finding that she failed to carry her burden of proving Dr. Savoy's malpractice.

2

**EVIDENCE**

In her first assignment of error, Whittington argues that the trial court erred in allowing the medical review panel's opinion into evidence. We agree. Louisiana Revised Statute 40:1299.47(H) provides that "[a]ny report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law." However, that provision presupposes the validity of the opinion itself. In this case, the opinion rendered by the medical review panel did not meet the requirements of La.R.S. 40:1299.47(G)(3).

Louisiana Revised Statutes 40:1299.47(G) provides that the "sole duty" of the medical review panel is "to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care." In performing that duty, the medical review panel is not to render an opinion on the merits if "there is a material issue of fact, *not requiring expert opinion, bearing on liability* for consideration by the court." La.R.S. 40:1299.47(G)(3) (emphasis added).

In this case, the medical review panel's opinion seems to consider Ms. Whittington's complaint as relating to the complications associated with Dr. Savoy's surgery and disposes of the issue of the length of the scar as being immaterial. With regard to the ultimate conclusion, the panel's opinion states that "[w]e find the complications that occurred are certainly expected complications that can occur and are listed appropriately in the consent to the surgery. We also find the length of the incision is not truly material to the complaint herein and should be of least concern."

3

Had the complications arising from Dr. Savoy's surgery been the issue, the opinion would clearly have been admissible. However, the litigation is over the length of the scar, not the complications. Dr. Carroll, who was a member of the medical review panel, testified that, with regard to the length of the scar, the panel simply accepted Dr. Savoy's position to the effect that he extended the incision only "slightly towards the xiphoid process." This was a material issue of fact bearing on the doctor's liability which did not require an expert opinion for its determination. *See* La.R.S. 40:1299.47(G)(3). In fact, Dr. Carroll was of the opinion that, had Dr. Savoy extended the incision as asserted by Ms. Whittington, that action would have been a deviation from the accepted standard of care expected of the doctor. Thus, by reaching this factual conclusion, the medical review panel reached an opinion that exceeded its statutory authority. We find the trial court erred in admitting that opinion.

### MEDICAL MALPRACTICE

In her second and third assignments of error, Whittington argues that the trial court erred in finding Dr. Lindsay unsure of the length of the incision made by him and in finding that she failed to satisfy her burden of proof with regard to Dr. Savoy's malpractice.

The plaintiff bears the burden of proving that a doctor committed malpractice. Dr. Savoy practices in the specialty of general surgery. Accordingly, pursuant to La.R.S. 9:2794(A), Whittington must prove (1) the degree of care ordinarily practiced by a general surgeon; (2) that Dr. Savoy either lacked this degree of knowledge or skill or failed to use reasonable care and diligence along with his

4

best judgment in applying that skill; and (3) that as a proximate cause of his lack of knowledge or skill or the failure to exercise this degree of care, she suffered an injury she would not have otherwise incurred. *See Brown v. Stickley*, 04-439 (La.App. 3 Cir. 9/29/04), 886 So.2d 515, *writ denied*, 05-0101 (La. 3/18/05), 896 So.2d 1011.

A trial court's findings on the issue of medical malpractice are factual in nature; thus, they are reviewed under the manifest error—clearly wrong standard of review. *Stobart v. State, through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). "The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id.* at 882.

After reviewing the record in its entirety, we find the trial court's conclusion that Whittington failed to satisfy her burden of proof, reasonable. A review of the record reveals that it was presented with differing views of the evidence regarding the length of the incision made by Dr. Savoy. Thus, its decision to credit his view is not manifestly erroneous.

In reaching its conclusion, the trial court noted three factors which favored Dr. Savoy:

1) The operative notes made by Dr. Savoy at the time of surgery are entitled to much weight as at the time there was no indication of litigation.

2) The testimony of Dr. Lindsay indicated that he was not at all sure how long the incision that he made was at the time of surgery.

3) The photographs taken after the second surgery do not prove which surgery resulted in the long scar. These should have been taken between the first and second surgery.

5

After reviewing the record, we find all three of these conclusions reasonable. The decision to place greater weight on Dr. Savoy's post-operative notes was within the trial court's discretion as the factfinder. The same holds true with regard to the photographs of Whittington's abdomen taken after Dr. Lindsay performed surgery. The trial court's conclusion that they offered no help in determining the length of Dr. Savoy's incision, is very reasonable. As the trial court stated, had the photographs been taken between the surgeries, they would have offered incontrovertible proof as to the length of the incision made by him.

***Dr. Lindsay***

In the second factor, the trial court found that Dr. Lindsay was unsure of the length of his incision on Whittington. In his deposition, Dr. Lindsay did not know the length of Whittington's prior scar, but said that he thought it extended from her umbilicus up to near the xiphoid process. He denied extending the existing scar towards the xiphoid process. Although he admitted that he was responsible for a scar, he described it as being a scar within a scar.

When questioned about the surgery he performed, Dr. Lindsay could not specifically recall whether he extended Whittington's scar:

> A    I don't believe I did. I would have to look at my report. I think if it was it was not too much, maybe a little bit. Let's see. Well my description was, you know, upper midline scar, large bulge, I don't remember extending it, but it's possible, but it wouldn't have been—I don't think it would have been a lot, a centimeter or two maybe.
>
> Q    In what direction?
>
> A    Probably toward the xiphoid to smooth it out superiorly, toward her head, and that would have been really probably the only reason is just to get it to lay down better, but I don't—you know, it was already pretty much up there.

He was also questioned pertaining to Dr. Savoy's description of the incision he made, contained in his post-operative report:

> Q       You would agree that his operative report, which you just read, doesn't make reference to the fact . . .
>
> A       Well, it doesn't say really how long.
>
> Q       . . . that an incision was made from the umbilicus to the xiphoid process, correct?
>
> A       It says the umbilicus was, you know, detached. I don't think it says one way or the other if I read it correctly. Let's see, it talks about lateral dissection, okay, the incision was opened up slightly toward the xiphoid process. It was—indeed it may not have gone all the way to the xiphoid and that's probably correct, but it certainly was most of the upper midline. I'm not sure that I took it up as far as the xiphoid either. You try to avoid that if you can. The xiphoid gets a little tender.

Based on the foregoing testimony, the trial court's finding that Dr. Lindsay did not know the length of his incision, was reasonable. In one instance, he was adamant that he did not extend her scar; however, in the next instance, he was unsure and said that he may have extended it. As these answers conflict, we find no error in the trial court's conclusion.

***Standard of Care***

On the issue of whether Whittington satisfied her burden of proof, the trial court heard testimony from both Drs. Savoy and Lindsay, as well as from Dr. Daniel Carroll, a general surgeon, who served as a member of the medical review panel.

In performing surgery, all three doctors stated that a surgeon cannot always anticipate what a procedure will entail once he opens a patient up, as sometimes a more extensive procedure is required than first thought. This includes

7

the length of the incision needed to perform the procedure. Dr. Lindsay testified that it is a judgment call for the surgeon as to how long an incision has to extend. Dr. Savoy explained that one instance in which a longer incision may be needed is when the surgeon needs to get sufficient tissue so that the skin will flatten out, rather than bulge, when sewn back up. Dr. Carroll agreed, stating that a surgeon may need to extend his initial incision when closing in order for the skin to lie flat once the incision is closed.

Based on the foregoing testimony, we find that the standard of care required of a surgeon is to make the incision long enough to perform the intended procedure and sufficiently long so that the skin lies flat after the incision is closed. Thus, the length of the incision is left to the surgeon's best judgment.

### *Failure to Use Reasonable Care*

Whittington testified that Dr. Savoy told her what he proposed to do to correct her abdomen, prior to surgery. She said that he was going to open her scar, removing both it and some fatty tissue, and that he might have to go on each side and underneath the scar in order to tuck in the tissue which drooped. She said that he also indicated that he might have to remove her navel.

Prior to surgery, Whittington stated that she did not have a scar above her umbilicus. Afterwards, she stated that her incision extended from her pubis to her breastbone, which shocked her as she had no idea that she would have a scar above her navel. Whittington testified that had she known the outcome, she would not have undergone the surgery, as she was able to hide her original scar with her underwear, but that she could not hide this scar.

8

Unhappy with Dr. Savoy, her scar, and the painful protuberance which developed, Whittington stated that she sought treatment from Dr. Lindsay. She stated that she underwent a second surgery on June 15, 1998, during which Dr. Lindsay removed scar tissue and the painful fatty tissue. Whittington testified that Dr. Lindsay did not extend her scar any, but instead made his incision in the scar. She said that this incision did not extend all the way to the top of Dr. Savoy's incision. She said that she was satisfied with the outcome of this surgery, but was still self-conscious about her scar.

Whittington's husband, Michael, testified that he was familiar with her body, as they had previously dated a couple of years prior to her surgery. He stated that they resumed dating a couple of months after she underwent surgery from Dr. Savoy, and that they married six months later. By the date of the trial, they had physically separated from each other. Michael testified that the scar from Dr. Savoy's surgery extended from Whittington's navel up approximately seven inches toward her sternum. He said that the scar from Dr. Lindsay's surgery was located on the side of the existing scar and extended up approximately six inches toward her sternum.

Dr. Savoy testified that he evaluated Whittington for lower abdominal pain and a lower abdominal disfiguring scar. After detecting an incisional hernia, he recommended surgical repair. He stated that Whittington wanted to correct her scar and the appearance of her lower abdomen; thus, the hernia repair and abdominoplasty were scheduled. Dr. Savoy said that he informed Whittington that the abdominoplasty would require a lengthier incision and that he would have to remove her umbilicus and then replace it when closing the incision. In order to do

9

so, he stated that he would have to make an incision above the umbilicus so that the skin would lie right after the incision was closed. He informed her that she could possibly lose her umbilicus as a result of this procedure, but said that she told him to do whatever it took to correct the appearance of her lower abdomen.

In his operative notes, Dr. Savoy first described the lower abdominal hernia repair, after which he began the abdominoplasty. In doing so, he stated that "beginning at the umbilical incision, the umbilical incision was opened up slightly towards the xiphoid process." Dr. Savoy testified that this indicated that his incision went approximately three to four inches above the umbilicus, but not all the way to the xiphoid process. Had he done so, he said that he would have documented it in his notes. He explained that in order to repair Whittington's scar, he had to go out a little beyond the scar itself, which included removing her umbilicus and extending his incision above it. However, he denied extending it eight inches up to the xiphoid process, as depicted in the photographs submitted by Whittington.

After the surgery, Dr. Savoy testified that Whittington developed several seromas and a painful protuberance above the umbilicus. He stated that both of these were common occurrences following this type of surgery. Although the consent form signed by Whittington did not specifically state that an incision would extend above the umbilicus, Dr. Savoy testified that he advised her of the need for such an incision and she consented to it.

Dr. Lindsay testified that he first examined Whittington on June 8, 1998, at which time she complained of pain in her upper abdominal wall, along with a protuberance in her upper midline from her prior surgery. He stated that he was

10

unsure if Whittington had an upper abdominal hernia, so they decided to perform surgery to reduce this painful bulge and her scar. Dr. Lindsay stated that he did not know the exact length of Whittington's scar prior to his surgery; however, he said that it extended from her umbilicus to the xiphoid process or at least a major portion of her upper midline.

Whittington underwent the second surgery on June 15, 1998. In performing the procedure, Dr. Lindsay could not remember whether he extended Whittington's abdominal scar up toward the xiphoid process. His post-operative notes state that "[t]he upper midline was opened down to the fascia, the fascia was not violated. There was quite a bit of dense scarring in the midline, this was excised along with a lot of fatty tissue to remove the bulging scar." If he did extend the incision above the umbilicus, Dr. Lindsay said that it was only a centimeter or two up toward the xiphoid process in order to get the skin to smooth out when he closed the incision. However, he later denied creating an additional scar above the umbilicus, as he described the scar he created as a scar within the already existing scar.

Dr. Lindsay stated that it was extremely unusual to make an eight inch incision above the umbilicus to repair an incisional hernia in the lower abdomen. However, he did not find that it was a deviation from the standard of care expected of a surgeon.

Dr. Carroll testified that he was familiar with both procedures performed by Dr. Savoy. Based on Whittington's original lower abdominal scar, her description of her abdomen prior to surgery, and his presumption as to her body habitus, it would be a deviation from the standard of care for a surgeon to make an incision from the

11

umbilicus to the xiphoid process. He felt that an incision of three finger widths above the umbilicus would be sufficient to correct the appearance of the "butt cheeks" in Whittington's lower abdomen.

Dr. Carroll opined that Dr. Savoy did not commit malpractice in performing the two procedures. He based his opinion on Dr. Savoy's post-operative notes, which were dictated and transcribed on the date of the surgery. Those notes stated that Dr. Savoy extended his initial incision, which was below the umbilicus, slightly up toward the xiphoid process. Dr. Carroll interpreted "slightly" to mean much less than half of the way between the umbilicus and the xiphoid process. He further relied on a drawing by Dr. Lindsay, which depicted Whittington's abdomen and scar at the time he examined her. He felt that the drawing did not depict the scar extending to the xiphoid process.

Dr. Carroll stated that the medical review panel weighed this evidence against Whittington's affidavit, which revealed a plaintiff who had a number of problems with what had occurred approximately two years after the initial surgery. He noted that the panel did not find the incision's length a determining factor in whether Dr. Savoy performed the ventral hernia repair and abdominoplasty improperly.

Based on the foregoing evidence, we find that the trial court was presented with two differing views of the evidence as to whether Dr. Savoy committed malpractice. Dr. Savoy testified that he extended his incision approximately four inches above the umbilicus, and the medical review panel found that he performed the hernia repair and the abdominoplasty properly. We further find

that Dr. Lindsay's testimony is ambivalent as to the length of the incision he made when performing the later surgery on Whittington. This issue could have easily been proved by the introduction of a photograph taken after Dr. Savoy's surgery, but prior to Dr. Lindsay's surgery. Although trite but true, a picture is worth a thousand words. In this instance, one photograph would have proved Whittington's claim. However, as she failed to submit such a photograph, we find no error in the trial court's ruling that she failed to carry her burden based on the evidence in the record. Accordingly, these assignments of error are without merit.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to the plaintiff-appellant, Veronica Ray Whittington.

**AFFIRMED.**